IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

THOMAS RAY DARYL WILSON                                                                    PLAINTIFF

v.                                        Civil No. 3:21-cv-03069-TLB-MEF

CORPORAL ALEXANDRIA PARKISON,
Boone County Detention Center (BCDC);
CORPORAL JAMES KELLEY, BCDC;
SERGEANT SHAWN HARP, BCDC; and
JAILER WATHA HONEYMAN, BCDC                                               DEFENDANTS

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

Plaintiff, Thomas Ray Daryl Wilson ("Wilson"), filed this *pro se* action pursuant to 42

U.S.C. § 1983.  Wilson proceeds *pro se* and *in forma pauperis.*

While he was detained in the Boone County Detention Center ("BCDC"), Wilson contends

his constitutional rights were violated in the following ways: (1) he was denied legal copies by

Corporal Parkison, thus preventing his access to the court; (2) he was retaliated against by Corporal

Parkison; (3) excessive force was used against him by Sergeant Harp and Corporal Kelley; and

(4), he was denied due process by Corporal Honeyman in connection with his lockdown and

disciplinary hearing.

Before the Court is the Defendants' Motion for Summary Judgment filed on March 25,

2022.  (ECF Nos. 45-47).  Wilson responded to the motion on August 3, 2022.[1]  (ECF No.

---

[1] Wilson was given multiple extensions of time to respond to the Summary Judgment Motion.  (ECF Nos.
53, 72, 81, 87).

1

88).   On August 11, 2022, Defendants filed a Reply in Support of Their Motion for Summary Judgment (ECF No. 89) and Defendants' Statement of Undisputed Facts in Support of Their Motion for Summary Judgment (ECF No. 90), which offered additional argument in reply to Plaintiff's response.   Defendants also filed a supplement, the Affidavit of Jason Day (Jail Administrator) on August 15, 2022.   (ECF No. 91).   Plaintiff filed a sur-reply on September 21, 2022.   (ECF No. 94).   Defendants filed another supplement on September 26, 2022.   (ECF No. 96).   The Defendants' Motion for Summary Judgment is ripe for decision.

Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3) (2011), the Honorable Timothy L. Brooks, United States District Judge, referred this case to the undersigned for the purpose of making this Report and Recommendation on the Motion for Summary Judgment.

## I.      BACKGROUND

According to Wilson, on August 12, 2021, he was in the dayroom of C-pod when Corporal Parkison was doing her walk through.   (ECF No. 2 at 4).   Wilson informed her that he had been approved by D. Everhart for legal copies two days earlier but had not yet received the copies.   *Id.* Wilson asked Corporal Parkison if she could make the copies for him.   *Id.*   This is the point where the stories of the parties begin to diverge.

### A.  Wilson's Version of the Events

Wilson says Corporal Parkison replied that he would have to wait and have D. Everhart make the copies.   (ECF No. 2 at 4; ECF No. 88 at 3).   Wilson indicates he had the legal papers in his hand.   (ECF No. 88 at 24).   Wilson denies he used any insolent or profane language when

speaking to Corporal Parkison.   *Id*. at 3.[2]   He informed Corporal Parkison that he was going to file a grievance.   (ECF No. 2 at 4).

A short time later, Sergeant Harp, Corporal Kelley, and Corporal Parkison returned to C-pod.   (ECF No. 2 at 5).   Sergeant Harp "aggressively marched up the stairs to where I was standing, which was in the doorway of C-6."   *Id.*   Sergeant Harp then "used excessive force with his belly and chest to shove me from the door way to the wall in C-6 and pinned me in place."   *Id.* Wilson alleges Sergeant Harp said: "Please do something so help me God I'll lose my job."   *Id.* at 5.   Wilson was ordered to lock-down for the rest of the night in C-8 and complied.   *Id.*   Wilson was in his cell venting when Sergeant Harp called him a "punk bitch," and "reopened C-8's door to continue to aggressively assault me in C-8 with his belly and chest."   *Id.*   Wilson was handcuffed by Corporal Kelley and Sergeant Harp.   (ECF No. 2 at 3; ECF No. 88 at 25). Corporal Kelley put Wilson on 24-hour notice that there would be a disciplinary hearing.   (ECF No. 2 at 2).

Wilson had a disciplinary hearing the following day.   (ECF No. 2 at 5).   Corporal Honeyman acted as the hearing officer.   *Id.*   Wilson maintains this was in direct violation of BCDC's policy which required the hearing officer to be of a higher rank than a jailer.[3]   *Id.* Wilson was placed on indefinite punitive segregation with a review every two weeks.   *Id.*

_____

[2] Wilson refers to witness statements he has submitted and maintains they back up his version of events. (ECF No. 88 at 46-47).   Unfortunately, these statements are not notarized or executed under penalty of perjury. Thus, the statements do not constitute affidavits or declarations under 28 U.S.C. § 1746 and cannot be used as evidence.   The Court notes Wilson was given explicit instructions on the requirements for affidavits and declarations under penalty of perjury.   (ECF No. 49).

[3] For the first time in his summary judgment response, Wilson states he did not have an opportunity to call witnesses or present video during his disciplinary hearing.   The Court will not address new issues raised at the summary judgment stage.   *Gilmour v. Gates, McDonald, and Co.*, 382 F.3d 1312, 1314-15 (8th Cir. 2004) (Liberal

### B.  Defendants' Version of the Events

According to Corporal Parkison, at approximately 7:28 p.m., Wilson asked her if she would access his property and make copies of paperwork he had there.  (ECF No. 45-1 at 1, 4).  Wilson indicated Officer Everhart, who worked the day shift, told Wilson he could do it.  *Id.* at 2. Corporal Parkison advised Wilson she was not authorized to access his property, and that he needed to talk to Officer Everhart in the morning and have him do it.[4]  *Id.*  Corporal Parkison states that "[a]t this point, Wilson became very agitated, cussing me, calling me a 'f liar' and stating that I was 'violating his Constitutional f------ rights."  *Id.*  Wilson then stated he was going to file a grievance on Corporal Parkison.  *Id.*

When Corporal Parkison advised Corporal Kelley and Sergeant Harp of the incident, the three of them went to C-pod at approximately 7:45 p.m.  (ECF No. 45-1 at 2).  According to Corporal Parkison, Wilson again called her a liar, began cussing, and became agitated.  *Id.* at 4. As a result, Corporal Parkison indicates that: "Wilson was cuffed and given a 24-hour notice for lockdown procedure and escorted to Booking to calm down.   I did not observe any excessive force by [Sergeant] Harp . . ..   Wilson was not visibly injured.   He did not say he was hurt.   He did not ask to see medical."   Corporal Parkison maintains it was necessary to lock Wilson down for the safety of the officers and inmates.  *Id.* at 2.

---

pleading standard for complaints "does not offer plaintiff an opportunity to raise new claims" or "amend [his] complaint through argument in a brief opposing summary judgment").

[4] In her incident report, Jailer Parkinson stated that she told Wilson she "wasn't going into his property." (ECF No. 45-1 at 4).   She makes no mention of whether she lacked the authority to access Wilson's property.  *Id.* at 2.

4

Corporal Kelley indicates that he and Sergeant Harp went to "speak with Wilson and investigate.   Wilson denied cursing Corporal Parkison and maintains she was lying.[5]"   (ECF No. 45-2 at 1).   Corporal Kelley did not see Sergeant Harp use any force against Wilson.   *Id.* Instead, Corporal Kelley indicates this is what occurred:

> Wilson was attempting to move out of his cell to go around Harp to talk to Parkison. Harp placed his body in front of him and moved along with him to stop him from being able to get around to Parkison.   That was for Parkison's safety and the safety of the facility.   Eventually, as Wilson continued to be agitated, I placed him in handcuffs and escorted him to booking so that he could calm down.   Around [7:52 p.m.], I brought him back to his pod for the night.

*Id.* at 1-2.[6]

Likewise, Sergeant Harp merely indicates he placed his body in front of Wilson to keep him from going around him to talk to Parkison.   (ECF No. 45-4 at 2).   Sergeant Harp asserts he did not place his hands on Wilson or use force against him.   *Id.*   Sergeant Harp also asserts that Wilson was not visibly injured, reported no injuries, and did not ask to see medical personnel.   *Id.*

---

[5] In his response, Wilson asks the Court to strike Corporal Kelley's affidavit because of "too many inconsistencies."   (ECF No. 88 at 13).   Wilson believes the affidavit contradicts and/or adds facts not contained in Corporal Kelley's incident report.   Wilson believes the incident report should have been amended.   Wilson similarly believes Sergeant Harp's affidavit should be stricken.   *Id.* at 9.   Under Rule 56(c)(4) of the Federal Rules of Civil Procedure "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."   A motion to strike under Rule 12(f) of the Federal Rules of Civil Procedure cannot be used to strike portions of a summary judgment motion or evidence in support.   *See e.g., Burlington N. Sante Fe Ry. Corp. v. Dakota Mo. Valley and West Ry., Inc.*, 347 F. Supp. 2d 708, 727 (D.S.D. 2004) (materials submitted in support or opposition of a summary judgment motion are not pleadings as contemplated by Rule 12(f)).   Wilson does not argue the affidavits do not comply with Rule 56(c)(4).

[6] Wilson makes much of the time discrepancies in some of the documents.   For instance, in his report Corporal Kelley indicates he was notified at 6:40 p.m. regarding the incident, while his affidavit contains the time as 7:45 pm.   (ECF No. 45-2 at 1, 4).   However, what time the incident occurred does not constitute a material fact.   A fact is "material" if it may "affect the outcome of the suit."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Corporal Parkison attended the disciplinary hearing.  (ECF No. 45-1 at 2).  Corporal Honeyman acted as the hearing officer.  (ECF No. 45-5 at 3).  Wilson was charged with: (1) lying or providing a false statement to an officer or staff member; (2) conduct which disrupts or interferes with the security and/or orderly running of the detention facility; (3) insolence or disrespect toward a staff member; and (4), using abusive, indecent, or obscene language.  *Id.*  The disciplinary incident report indicates that Sergeant Harp and Corporal Parkison appeared at the hearing and there was also video evidence available.[7]  Wilson was found guilty and put on an indefinite lock-down with two-week review.  *Id.* at 3.  Corporal Honeyman indicates Wilson's lock-down was ended early because he apologized for his behavior.[8]  *Id.* at 1.

### C.  Policies of the BCDC

### 1.  Grievance Procedure/Policy

With respect to the grievance procedure, the inmate rules provide as follows:

P) Inmate/Detainee Grievances—Grievance forms are available upon request. Any inmate/detainee wishing to file a grievance should make the grievance brief and direct and addressed to appropriate personnel.  All grievances shall be turned in to the on duty Detention officer and [illegible][9] . . .  Jail Administrator.  A copy of the response will be given to the issuing Inmate/Detainee.  The original shall be kept on file.

(ECF No. 45-9 at 1-2).

The grievance policy provides that inmates may obtain a grievance form from any detention officer.  (ECF No. 45-10 at 2, 4).  With respect to substance, the policy provides: "The

---

[7] Neither party provided the Court with any video evidence.

[8] Wilson indicates he did not apologize for his behavior.  (ECF No. 88 at 8).  He objects to this portion of Corporal Honeyman's affidavit as speculation and/or hearsay.

[9] This page of the exhibit has apparently been cut off at the top line during copying/scanning.

detainee must clearly describe all facts all request[s], then give grievance to any Detention Officer." *Id.* at 2.   Emergency grievances are to receive immediate attention.   *Id.*   Non-emergency grievances will be "investigated and if valid, resolved within a reasonable amount of time." *Id.*   Whether or not the grievance is found to have merit, "the grievant is informed of the disposition of the grievance, in writing, within ten (10) working days of the date the grievance was received." *Id.*   The "grievant may appeal any response or lack of response to the Sheriff or Jail Administrator who shall respond in writing." *Id.* at 3.   The policy also prohibits retaliation based on the filing of a grievance.   *Id.*   Specifically, the policy provides: "Employees are forbidden from punishing a detainee for writing a grievance.   Any perceived punishment shall be reported to the Jail Administrator without delay.   Substantiated reports of retaliation shall subject the employee to disciplinary action." *Id.*

## 2.  Detainee Discipline Policy

The detainee discipline policy places offenses into four separate categories.   (ECF No. 45-8 at 1).   Category I offenses are the most severe and can result in indefinite segregation, criminal charges, and loss of all privileges.   *Id.*   Category II offenses can result in segregation of 14 days, no privileges during segregation, and criminal charges.   *Id.*   Category III offenses can result in segregation of 7 days, no privileges during segregation, and possible criminal charges.   *Id.* Category IV offenses can result in segregation for 2 days and no privileges.   *Id.*   Wilson was charged with and found guilty of Category I, II, and III offenses.   (ECF No. 45-7 at 3-4).

7

### 3.   Use of Force Policy

The BCDC's use of force policy provides that "[d]etention officers will use the minimum amount of non-deadly force necessary to maintain the security and control of detainees and to prevent incidents from escalating into an emergency." (ECF No. 45-11 at 1). With respect to the use of non-deadly force, the policy provides:

b. Use of Non-Deadly Force by Detention Officers:

1) Under NO circumstances will detention officers be authorized to utilize deadly weapons of any type while inside the confines of the facility.

2) <u>Detention Officers may only use the minimum amount of force necessary to maintain order, restore discipline or obtain compliance with a lawful order.</u> Examples of the type of behavior that may justify the use of non-deadly force are, as follows:

   a. When a detainee(s)/arrestee(s) are assaulting or appear likely to assault another detainee or officer.
   b. When a detainee(s)/arrestee(s) . . . are destroying, or appear likely to destroy property.
   c. When it appears that a detainee/arrestee is or may be preparing to escape.
   d. When a detainee(s)/arrestee(s) is disrupting the function or stability of the Detention Facility.

3) **A detention officer will never use any type of force to punish a detainee/arrestee or use force solely in response to insulting words that may be directed toward him/her by a detainee.**

4) In situations where immediate physical harm does not appear to be imminent, detention officers will initiate the following alternatives prior to using force on any detainee.

   a. Verbally address the detainee/arrestee and attempt to persuade him/her to stop behavior.
   b. Verbally advise the detainee/arrestee of the consequences that will occur if he/she does not stop the behavior.

8

       c.   Request assistance from either detention officers or the Detention Facility Administrator who, by virtue of their presence, may persuade the detainee/arrestee to stop his/her behavior.

5)   Should the steps listed in 4, b) above fail, or should a situation warrant the use of force to restrain a detainee/arrestee and stop him/her from induc[]ing physical harm on another officer, detainee/arrestee or self, detention officers may:

       a.   Use physical holds and take down techniques to gain control of a detainee/arrestee or if this fails;

       b.   Use planned kicks and blows to **<u>not-vital areas</u>** of the detainee's body to take down the detainee.

*Id.* at 2-3.

## II.    LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Comm. v. Dow Chem. Co*., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion

9

is insufficient to survive a motion for summary judgment." *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.    DISCUSSION

Defendants have moved for summary judgment on the following grounds: (1) Wilson failed to exhaust his administrative remedies with respect to all claims, except his claim that Corporal Honeyman did not have the authority to hold the disciplinary hearing; (2) Wilson's access to the courts claim against Corporal Parkison fails because he suffered no actual injury; (3) Wilson's excessive force claims against Sergeant Harp and Corporal Kelley fail because only a reasonable amount of force was used; (4) Wilson's due process claims regarding the one-night lock-down and disciplinary hearing against Corporal Kelley, Corporal Parkison, and Corporal Honeyman, fail because the punitive segregation was for a short period of time, in furtherance of legitimate facility interests, no liberty interest exists as to the outcome of a disciplinary hearing, and no injury-in-fact can be shown; (5) Defendants are entitled to qualified immunity; (6) no basis for supervisory liability exists; and (7), there is no basis for official capacity liability.

### A.  Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") in 42 U.S.C. § 1997e(a) provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such

administrative remedies as are available are exhausted."   Exhaustion is mandatory.   *Woodford v. Ngo*, 548 U.S. 81, 85 (2006).   The provision was enacted "to reduce the quantity and improve the quality of prisoner suits ... afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case."   *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002).

In "[a]pplying this statute ..., we first consider whether administrative remedies were 'available' to [Wilson]."   *Muhammad v. Mayfield*, 933 F.3d 993, 1000 (8th Cir. 2019) (citing *Ross v. Blake*, 578 U.S. 632, 642 (2016)).   "If so, we then consider whether [Wilson] *properly* exhausted his administrative remedies."   *Muhammad*, 933 F.3d at 1000 (emphasis in original) (citing *Woodford*, 548 U.S. at 93).

### 1.   Availability of Remedies

Inmates "must exhaust *available* remedies, but need not exhaust unavailable ones."   *Ross*, 578 U.S. at 642.   In *Muhammad*, the Eighth Circuit stated that the:

> Supreme Court recognizes at least three circumstances where an administrative remedy is 'not capable of use' and thus unavailable: (1) where 'it operates as a simple dead end—with officers consistently unwilling to provide *any* relief to aggrieved inmates;' (2) where the 'administrative scheme' is 'so opaque' to be practically 'incapable of use;' and (3) where 'administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'

*Muhammad*, 933 F.3d at 1000 (quoting *Ross*, 578 U.S. at 643-644).

Here, Wilson does not argue that the administrative procedures at the BCDC were somehow unavailable, or that the procedures were incapable of use, or that he was thwarted from

11

taking advantage of the grievance procedure.   Rather, Wilson focuses his arguments on whether he properly exhausted his administrative procedures.

### 2.   Proper Exhaustion

In *Jones v. Bock*, 549 U.S. 199 (2007), the Supreme Court concluded that "to properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules."   *Id*. at 218 (cleaned up).   The Court stated that the "level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."   *Id*.   A prisoner's remedies are exhausted "when [the] inmate pursues the prison grievance process to its final stage and receives an adverse decision on the merits."   *Hammett v. Cofield*, 681 F.3d 945, 947 (8th Cir. 2012).

The BCDC policy provides little detail as to what an inmate must include in a grievance. It provides only that "[t]he detainee must clearly describe all facts all request[s], then give grievance to any Detention Officer."   (ECF No. 45-10 at 2).   As can be seen from the exhibits, the grievances may be submitted electronically or in paper form.[10]

According to Jail Administrator Jason Day, Wilson did not follow the grievance procedure for his claims against Corporal Parkison for failing to make his copies on August 12, 2021; his claim against Sergeant Harp for an alleged use of excessive force; and his claims against Corporal Kelley, Corporal Parkison, and Corporal Honeyman for punitive segregation.   (ECF No. 45-6 at

---

[10] When Wilson asked how he obtained copies of his grievances, he was asked whether he was referring to electronic grievances or paper grievances.   (ECF No. 45-15 at 19).

2).   Administrator Day asserts that the only claim Wilson submitted a grievance regarding was whether Corporal Honeyman had the authority to hold the lockdown hearing.   *Id.*   Furthermore, to the BCDC's knowledge, "Wilson did not ask for medical for any injury that he claims is a result of any excessive force incident on August 12, 2021."   *Id.*

Wilson filed a grievance on August 12, 2021, complaining he could not get copies of legal forms made in violation of his "right to be able to correspond with the courts."   (ECF No. 45-14 at 5).   He indicated it had been two days since his request for copies had been approved.   *Id.*   The document is clearly labeled as a grievance and not a request.   *Id.*   Wilson specified the grievance was for Administrator Day.   The grievance notes that it was resolved without appeal.   *Id.* However, nothing on the document indicates what the disposition of the grievance was. Nevertheless, the summary judgment record does not contain any evidence that Wilson appealed the resolution of the grievance.

Wilson also submitted a grievance in which he contended that pursuant to policy only a sergeant or someone higher in command was allowed to place inmates in punitive segregation. (ECF No. 45-15 at 1).   In response, he was told both corporals and sergeants had the ability to "hear a lockdown case and then rule on it."   *Id.*   If Wilson disagreed, he was told to appeal to Administrator Day.   *Id.*   Wilson appealed the issue.[11]   *Id.* at 4.   He was again told any corporal or sergeant was able to conduct a disciplinary hearing.   *Id.*   Upon examination, it appears that these grievances were submitted electronically.   *Id*.; *see also* ECF No. 45-14 at 5.

_____

[11] Wilson submitted his appeal on September 1, 2021.   (ECF No. 45-15 at 4).

According to Wilson, he asked Corporal Kelley for a medical request form after the August 13th hearing.  (ECF No. 88 at 4).  Wilson asserts he filled it out and turned it in.  *Id.*  Once the form is turned in, Wilson states it is out of "my control on if it gets to the nurse, it solely rest[s] in the hands of the Jailers."  *Id.*  Wilson does not indicate he submitted a second grievance or appealed the non-response to his original grievance.

Wilson also claims that he submitted paper grievances on his other claims on August 15, 2021, but he mailed his copies of the grievances to defense counsel on or about September 30, 2021.  *Id.* at 5.  Wilson contends he never received copies back from defense counsel.  *Id.* Further, he states he never received any responses to the grievances themselves.  *Id.*

Wilson has submitted a copy of a paper grievance and/or grievance appeal dated August 13, 2021, in which he states he was disputing the disciplinary allegation that he was cursing at staff.  (ECF No. 88 at 40).  The form is handwritten and is labelled "Inmate Grievance Appeal Form."  *Id.*  The form contains a line for the signature of the receiving officer.  *Id.*  An illegible signature is contained on that line.[12]  *Id.*  The form is also dated as received from the inmate on August 15, 2021, at 1:24 pm.  *Id.*

A second grievance form addresses the fact that Wilson was locked down on August 12th by Sergeant Harp, and then locked down a second time for the same conduct following his disciplinary hearing.  (ECF No. 88 at 41).  This form is labeled "Inmate Grievance Form."  *Id.*

---

[12] In his statement of disputed facts, Wilson identifies the receiving officer as Jailer Bryan.  (ECF No. 88 at 5).

This document appears to be signed and dated by the same person who signed the grievance in which Wilson denied having cursed at detention center staff.   *Id.* at 40-41.

A third grievance, dated August 13th, addresses Wilson's claims that Sergeant Harp used excessive force against him on August 12th.   (ECF No. 88 at 42).   The grievance is dated August 13th and is on an inmate grievance form.   *Id.*   Once again, the form appears to have been signed and dated by the same person.

A fourth document is completely handwritten and labelled "Inmate Grievance Appeal Form."   (ECF No. 88 at 43).   The form indicates it is an appeal from an August 13, 2021, grievance regarding Corporal Kelley violating Wilson's Eighth Amendment rights.   *Id.*   Wilson indicates he had received no response from Administrator Day to his grievance.   *Id.*   Wilson indicates the jail administrator only has three days to respond to a grievance.[13]   *Id.*   Wilson dated the grievance appeal form August 19th.   *Id.*   There is a signature on the line for the grievance appeal receiving officer, however, the last name of the signature is illegible.   *Id.*   The first name appears to be the initials Cpl. presumably standing for corporal.   *Id.*   It is marked as having been received on August 24th at 8:50 p.m.   *Id.*

A fifth document, completely handwritten, and dated by Wilson on August 29, 2021, indicates it is an appeal from an August 13th grievance regarding Sergeant Harp's conduct.   (ECF No. 88 at 44).   Wilson states he received no response from Administrator Day to the grievance.

---

[13] In his response, Wilson notes the grievance policy gives the administrator 10 days to respond—not three days as Wilson states on the grievance appeal form.   (ECF No. 88 at 5).

*Id.* The receiving officer is once again a corporal with the last name indecipherable. *Id.* The grievance appeal is noted to have been received on August 24th at 8:50 p.m.

By affidavit, Jail Administrator Day maintains that *none* of these handwritten grievances were contained in Wilson's jail file. (ECF No. 91 at 1). Specifically, Administrator Day says: "Our records do not indicate that these grievances were actually turned in and made part of the file." *Id.* He therefore disputes that any of these grievances were proper grievances. *Id.* Finally, Administrator Day asserts he does not recognize the signatures. *Id.* Administrator Day does not refer to Wilson's identification of the officer receiving the first three grievances/grievance appeals on August 15, 2021, as Jailer Bryan, nor does he indicate whether Jailer Bryan was an employee of the BCDC during the relevant period.

Failure to exhaust is an affirmative defense that must be proven by the Defendants. *Porter v. Sturm*, 781 F3d 448, 451 (8th Cir. 2015) (citing *Jones*, 549 U.S. at 211-12). Wilson has asserted he filed grievances, appealed those grievances, and has provided copies of the grievances. The grievance procedure does not require the naming of all officers involved, or any detailed level of specificity, and it contains no time constraints. The records indicate grievances could be submitted both in paper form and electronically. No one has asserted that Jailer Bryan was not employed at the facility, was not working during the relevant period, or could not have been the receiving officer for any other reason. Indeed, Administrator Day only makes the vague and unhelpful statement that he does not recognize the largely illegible signature.

Defendants have failed to meet their burden of proof on the exhaustion defense.   Based on the summary judgment record taken in the light most favorable to Wilson, there are genuine issues of material fact as to whether Wilson properly exhausted his administrative remedies.

### B.   Access to the Courts

On August 12, 2021, Corporal Parkison refused to make copies of legal documents for Wilson, who contends he had the documents in his hand.   Corporal Parkison indicates Wilson wanted her to go into his property, locate the documents, and then copy them.   Under either scenario, Wilson was not denied access to the courts.

The Supreme Court has held "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith*, 430 U.S. 817, 828 (1977).   Nevertheless, *Bounds* "did not create an abstract, freestanding right to a law library or legal assistance." *Lewis v. Casey*, 518 U.S. 343, 351 (1996).   An inmate cannot prevail on an access-to-courts claim unless he can demonstrate he suffered prejudice or actual injury resulting from the prison officials' conduct. *See Lewis*, 518 U.S. at 351-2; *see also Klinger v. Dep't of Corr.*, 107 F.3d 609, 617 (8th Cir. 1997) (to prevail on access-to-courts claim, inmate must show actual injury or prejudice even if denial of access to library is complete and systematic).   "To prove a violation of the right of meaningful access to the courts, a prisoner must establish the state has not provided an opportunity to litigate a claim challenging the prisoner's sentence or conditions of confinement in a court of law, which resulted

in actual injury, that is, the hindrance of a nonfrivolous and arguably meritorious underlying legal claim.'"   *Hartsfield v. Nichols*, 511 F.3d 826, 831 (8th Cir. 2008) (citations omitted).

Here, Wilson identifies no such actual injury from the refusal to provide him with copies. Wilson has not shown that Corporal Parkison's actions resulted in the hindrance of a nonfrivolous and arguably meritorious legal claim.   Absent an actual injury, Wilson cannot prevail on his access to the courts claim.   Corporal Parkison is entitled to summary judgment on this claim.

Corporal Parkison also contends she is entitled to qualified immunity on this claim. "Government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"   *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341-43 (1986)).   "[O]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines."   *Moore v. City of Desloge, Mo.*, 647 F.3d 841, 846 (8th Cir. 2011).

The qualified immunity inquiry consists of two questions: "(1) whether the facts alleged or shown, construed in the light most favorable to the Plaintiff, establish a violation of a constitutional right; and (2) whether that constitutional right was clearly established as of the time of the relevant conduct such that a reasonable official would have known that his actions were unlawful."   *Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (citation omitted).   The Court can answer the questions in either order.   *Pearson v. Callahan*, 555 U.S. 223, 242 (2009).   A § 1983 plaintiff

18

may defeat qualified immunity only if the answer to both questions is yes. *Boude v. City of Ramore*, 855 F.3d 930, 933 (8th Cir. 2017) (citation omitted).   Having found no constitutional violation exists in this case, Corporal Parkison is entitled to qualified immunity on the claim. *Krout*, 583 F.3d at 564 (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

### C. Retaliation

Corporal Parkison does not separately address Wilson's claim that she retaliated against him after he told her he was filing a grievance.   Specifically, Wilson contends his threat to file a grievance against Corporal Parkison was the reason she brought Corporal Kelley and Sergeant Harp back into C-pod to confront Wilson.

The "filing of a prison grievance, like the filing of an inmate lawsuit, is protected First Amendment activity." *Lewis v. Jacks*, 486 F.3d 1025, 1028 (8th Cir. 2007).   "[A]n act in retaliation for the exercise of a constitutionally protected right is actionable under [§] 1983 even if the act, when taken for a different reason, would have been proper." *Madewell v. Roberts*, 909 F.2d 1203, 1206 (8th Cir. 1990).

To succeed on a retaliation claim, Wilson must prove: "(1) he engaged in a protected activity, (2) [Corporal Parkison] took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Spencer v. Jackson Cnty.*, 738 F.3d 907, 911 (8th Cir. 2013).   "The ordinary-firmness test is designed to weed out trivial matters from

19

substantial violations of the First Amendment." *Gonzalez v. Bendt*, 971 F.3d 742, 745 (8th Cir. 2020).   In *Gonzalez*, the Eighth Circuit stated:

> [t]he test is an objective one, not subjective.   The question is ... [w]hat would a person of "ordinary firmness" have done in reaction to the [adverse action]? Summary judgment is appropriate if there is insufficient evidence the adverse action would deter a person of ordinary firmness from continuing to engage in First Amendment protected activity.   We consider [Wilson's] actions in response to [Corporal Parkison's] alleged retaliation as evidence of what a person of ordinary firmness would have done.

*Id.* (cleaned up).

Here, the alleged retaliatory action occurred in response to Wilson's threat that he would file a grievance against Corporal Parkison.   Assuming a threat to file a grievance constitutes a protected First Amendment activity, the Court does not believe, under the circumstances of this case, that a person of ordinary firmness would be deterred from engaging in protected activity.   In fact, as evidence of what a person of ordinary firmness would do, the Court notes that Wilson followed through and submitted a grievance against Corporal Parkison.   Wilson also filed various other grievances concerning the events of August 12-13, 2021.   Accordingly, Corporal Parkison is entitled to summary judgment on this claim.   Further, having found no constitutional violation exists with respect to this claim, Corporal Parkison is entitled to qualified immunity on the claim. *Krout*, 583 F.3d at 564 (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

### D.  Excessive Force

The objective reasonableness standard applies to excessive force claims brought by pretrial detainees.   *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015).   "[T]he defendant's state of

mind is not a matter that a plaintiff is required to prove." *Id.* at 394. To demonstrate excessive force, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 396. The objective reasonableness of a use of force "turns on the 'facts and circumstances of each particular case.'" *Id.* at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "[O]bjective circumstances potentially relevant to a determination of excessive force" include:

> the reasonableness or unreasonableness of the force used; the relationship between the need for the use of force and the amount of force used; the extent of plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether plaintiff was actively resisting.

*Id.* (citing *Graham*, 490 U.S. at 396).

This determination must be made "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 576 U.S. at 397. "A court must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)). An action is objectively unreasonable if it is not reasonably related to legitimate governmental interests, such as maintaining order and security, or is excessive in relation to that objective. *Id.* at 398-99.

Viewing the facts asserted in the light most favorable to Wilson, he has failed to demonstrate that there is a genuine issue of material fact as to whether Sergeant Harp used

excessive force against him.   Essentially, Wilson maintains that Sergeant Harp used his belly and chest to shove Wilson out of the doorway and then against the wall.   Wilson maintains that the use of any part of the body to exert excessive force violates the constitution.   (ECF No. 94 at 3). Sergeant Harp then unlocked C-8 after Wilson was locked down and essentially repeated the same actions.   (ECF No. 94 at 4).   Wilson points out he was not actively resisting and had followed verbal orders to lock down.   (ECF No. 88 at 13).   Wilson also contends that if he were trying to get past Sergeant Harp to Corporal Parkison, it is suspicious Corporal Parkison did not mention this fact in her own incident report.   The Court agrees.   Further, the Court notes Corporal Parkison made no mention of this in her affidavit either.   (ECF No. 45-1).   According to Wilson, he made no effort to move out of the cell towards Corporal Parkison.   (ECF No. 94 at 7).   It is, however, undisputed that Wilson was agitated, referred to Corporal Parkison as a liar, and was upset about not being able to obtain his copies.

Sergeant Harp's use of inappropriate and/or threatening language is insufficient to state a constitutional violation.   Verbal threats, insults, taunts, name calling, and the use of offensive language, while clearly reprehensible, does not constitute a constitutional violation.   *See e.g., Doe v. Gooden*, 214 F.3d 952, 955 (8th Cir. 2000).   Further, while it may seem from 20/20 hindsight that it was inadvisable for Sergeant Harp to enter cell C-8 after Wilson had entered his cell to be locked down, this does not equate to the use of excessive force.   Wilson was not taken to the ground, nor was he struck in anyway.   That is not to say that a blow is always necessary—it isn't; nor that the use of body weight alone to restrain a detainee can never constitute the use of excessive force—it can.   But the duration of Sergeant Harp's use of his body to block or hold Wilson against

22

the cell wall was very short, and no other physical interaction occurred other than Wilson being handcuffed by Corporal Kelley and taken to a booking cell for a cooling off period.

Further, there is no evidence that Wilson was injured in anyway.  While Wilson does maintain he submitted a medical request, the request is not in the record, and Wilson refers not to any injury he received from the use of force, but instead indicates he had several serious health conditions for which he had been or was being treated.  Wilson mentions having chronic obstructive pulmonary disease ("COPD") and having been in a car accident.  (ECF No. 88 at 6, 10-11).  In his summary judgment response, Wilson mentions having visible marks on his wrist from being handcuffed.  This slight injury proves insufficient as the Court of Appeals for the Eighth Circuit had held in the context of handcuffing that more than *de minimus* injuries must be suffered to support an excessive force claim.  *See e.g., Chambers v. Pennycook*, 641 F.3d 898, 907 (8th Cir. 2011).  Sergeant Harp and Corporal Kelley are entitled to summary judgment on the excessive force claim.

Both Defendants maintain they are entitled to qualified immunity on this claim.  Having found no constitutional violation exists with respect to this claim, the Court agrees that Sergeant Harp and Corporal Kelley are entitled to qualified immunity on the claim.  *Krout*, 583 F.3d at 564 (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

### E.  Due Process and the Disciplinary Hearing

Wilson first contends his due process rights were violated when he was punished the evening of August 12, 2021, by being placed on lockdown for his behavior, and then again being

23

found guilty of disciplinary violations the following day based on the same behavior.   Second, Wilson maintains Corporal Honeyman should not have acted as the disciplinary hearing officer. On this point, Wilson indicates that Section 36 of the Detainee Discipline Policy provides the following:

> The Detention Facility Administrator shall be Disciplinary Hearing Officer.   In the event of the absence of the Detention Facility Administrator or if the Detention Facility Administrator is personally involved in the incident or offense, the Chief Deputy or Sheriff will assume the responsibilities of Disciplinary Hearing Officer.

(ECF No. 88 at 7; ECF No. 94 at 23).

Pretrial detainees are presumed innocent and cannot be punished for the crime for which they have been charged.   *Bell v. Wolfish*, 441 U.S. 520, 535-37 (1979).   Not every administrative restriction or condition that adversely affects a pretrial detainee constitutes punishment; instead, if the restriction is reasonably related to a legitimate government objective such as maintaining institutional order and safety, it does not constitute punishment.   *Id.* at 539-40.   However, if the restriction is deemed punishment, a pretrial detainee has the right under the Due Process Clause —at a minimum—to notice and an opportunity to be heard.   *Id.*; *see also Wolff v. McDonnell*, 418 U. S. 539, 563-64 (1974).   A pretrial detainee may not be placed in segregation for a disciplinary infraction without written notice of the charges, an opportunity to call witnesses and present documentary evidence, and a written statement of the evidence relied upon and the reason for the disciplinary action.   *Wolff*, 418 U.S. at 563-66; *Dible v. Scholl*, 506 F.3d 1106, 1110 (8th Cir. 2007).

On August 12, 2021, Wilson was placed on lock-down after his encounter with Corporal Kelley, Sergeant Harp, and Corporal Parkison.   He was immediately given notice of a disciplinary

24

hearing to be held the following day.   Wilson maintains this period of lock-down constitutes punishment.   The Court disagrees.   This was a temporary and brief period of lock-down until a disciplinary hearing could be held.   Moreover, Wilson admits he was agitated and upset by what occurred and was venting in his cell.   Clearly, there was a legitimate governmental purpose in placing Wilson on temporary lock-down for safety and security reasons until a disciplinary hearing could be held--which occurred less than 24 hours later.

It is undisputed that Wilson was given 24-hour notice on the evening of August 12, 2021, that there would be a disciplinary hearing on August 13th.   Wilson was taken to booking for a cool down period and then returned to C-pod and locked down in his cell.   On August 13th, Wilson was given a hearing, found guilty of the offenses, and sentenced to a period of punitive segregation.   Wilson does not argue that Corporal Honeyman was biased against him in anyway, conspired with other named Defendants, or was in some other way not an impartial decisionmaker. Instead, Wilson merely argues that Corporal Honeyman was not authorized under BCDC rules to be a hearing officer.   Even assuming this is true, the violation of BCDC policies on who may serve as a hearing officer does not equate to a due process violation.   *Walton v. Dawson*, 752 F.3d 1109, 1122 (8th Cir. 2019) (failure to follow internal policies does not state a constitutional violation).   Instead, the focus is on whether the conduct violates the constitution.   Wilson's liberty interest was in an impartial due process hearing on a disciplinary matter.   He received all the process he was due.   Defendants are entitled to summary judgment on Wilson's due process claims.   Furthermore, having found no constitutional violation exists, Defendants are entitled to qualified immunity on the claim.   *Krout*, 583 F.3d at 564.

25

### F.  Supervisory Liability

"Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).   A supervisor may he held liable in two ways.   First, a supervisor can be held liable if he directly participated in the constitutional violation committed by someone he supervised.   *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010).   Second, a supervisor can be held liable "if his failure to train or supervise the offending actor caused the deprivation."   *Id.*

Here, Sergeant Harp had no participation in Corporal Parkison's act of refusing Wilson copies.   Regarding the alleged used of excessive force, Sergeant Harp was the direct actor, not someone he supervised.   *See e.g., Marsh v. Phelps Cnty.*, 902 F.3d 745, 754 (8th Cir. 2018) (where supervisor neither "ordered or directed" an inferior officer to violate the plaintiff's rights, "their alleged liability cannot be based on direct participation").

To prevail on a failure to train or supervise claim, a plaintiff must establish: (1) the supervisor was on "notice of a pattern of unconstitutional acts committed by subordinates"; (2) the supervisor was "deliberately indifferent to or tacitly authorized" the pattern of unconstitutional acts; (3) the supervisor failed to take "sufficient remedial action" to address the pattern of unconstitutional acts; and (4), the supervisor's failure to remedy the pattern of unconstitutional acts proximately caused the plaintiff's injury.   *Perkins v. Hastings*, 915 F.3d 512, 524 (8th Cir. 2019).   Wilson has failed to establish that any failure to train Corporal Parkison, Corporal Kelley, or Corporal Honeyman caused the alleged constitutional violation.   Wilson relies solely on what

26

happened to him on August 12-13, 2021.  He has produced nothing showing that a pattern of unconstitutional conduct existed, or that Sergeant Harp was deliberately indifferent to or tacitly authorized the conduct, or that he failed to take remedial action.

There is no basis for supervisory liability.   Sergeant Harp is entitled to summary judgment on this claim.

## G.  Official Capacity Liability

Finally, Wilson asserts an official capacity claim.   An official capacity claim is considered a claim against the employing governmental entity, here, Boone County, Arkansas.   *Crawford v. Van Buren Cnty.*, 678 F.3d 666, 669 (8th Cir. 2012).   "Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an 'official municipal policy,' (2) an unofficial 'custom,' or (3) a deliberately indifferent failure to train or supervise." *Corwin v. City of Indep., Mo.*, 829 F.3d 695, 699 (8th Cir. 2016) (citations omitted).

Wilson does not contend any of the BCDC policies were unconstitutional.   In fact, he contends the Defendants violated the policies of the BCDC regarding the use of force and who was qualified to serve as a hearing officer.   *Monell v. Dep't. of Soc. Srvs.*, 436 U.S. 659, 690-91 (1978) (violation must result from the governmental entity's custom or policy).   Violation of an existing policy is the opposite of establishing a constitutional violation due to an existing policy. Wilson points to no unofficial custom or failure to train or supervise.   No official capacity claim exists.   Defendants are entitled to summary judgment on this claim.

### H.  State Law Claims

To the extent Wilson is asserting any supplemental state law claims, the Court declines to exercise supplemental jurisdiction as all claims over which the Court had original jurisdiction have been dismissed.   28 U.S.C. 1367(c)(3).

### IV.    CONCLUSION

For the reasons stated, the Court recommends that Defendants' Motion for Summary Judgment (ECF No. 45) be **GRANTED**, and that all federal law claims be **DISMISSED WITH PREJUDICE**.   Further, to the extent Wilson asserts any state law claims, it is recommended that the Court decline to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3).

**The parties have fourteen (14) days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).   The failure to file timely objections may result in waiver of the right to appeal questions of fact.   The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 2nd day of November 2022.

/s/  *Mark E. Ford*
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE